# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN

_____

NIVALIS ENERGY SYSTEMS, LLC,
and TOWNSEND CAPITAL, LLC,

      Plaintiffs,

v.                                Case No. 2:25-cv-10058


LG ENERGY SOLUTION, LTD.,

                              **Demand for Jury Trial**

      Defendant.

---

## <u>COMPLAINT</u>

Plaintiffs Nivalis Energy Systems, LLC ("Nivalis") and Townsend Capital, LLC ("Townsend Capital") bring this civil action against Defendant LG Energy Solution, Ltd. ("LGES") for a declaratory judgment of contract avoidance, and compensatory damages for breach of contract, and in the alternative for unjust enrichment.

## I.      <u>INTRODUCTION</u>

1.    Nivalis is a business venture founded in 2020 with funding from Townsend Capital. Since its formation, Nivalis' principal business objective has been to develop and manufacture advanced battery technologies for use in various electric transport refrigeration applications, including cold storage transportation (refrigerated truck trailers) and logistics.

2.     As set forth herein, for the past several years, Nivalis has been developing a specialized battery pack that was designed to use off-the-shelf battery modules manufactured and warrantied by LGES.  The parties began extensive negotiations about supply agreements in 2021, and Nivalis made initial purchases of battery modules from LGES in December 2021 and November 2022 without a finalized supply agreement between the parties.

3.     Nivalis understood that it was purchasing modules that LGES marketed as "B-grade," but it was unaware of the nature and extent of the modules' defects and relied on LGES' representations that any defects in production that resulted in the modules receiving a "B-grade" label were cosmetic and inconsequential.

4.     Long after the purchases, Nivalis learned of the true nature and extent of the potential longevity and safety issues with the B-grade modules it had purchased from LGES during extended technical discussions that were required in order to secure LGES' warranty of Nivalis' battery packs utilizing the LGES modules.  Once Nivalis learned of the actual defects in the modules it had purchased from LGES, Nivalis concluded that the LGES modules were not fit for their ordinary purpose, not fit for Nivalis' intended purpose for their particular use (of which LGES was aware), and not even fit for any *alternative* purpose Nivalis explored to use these defective modules.

5.    Nivalis has concluded that the B-grade modules were economically unfit for any practical use, and that this loss of the economic value of the modules it had purchased was known to LGES and inhered in the modules at the time of Nivalis' purchases.  Nivalis therefore brings this civil action for avoidance of the contract under applicable international treaty law, and to recover its damages for breach of contract or in the alternative for unjust enrichment.

## II.    PARTIES

6.    Nivalis is a limited liability corporation organized under the laws of the State of Delaware, with its principal place of business located in Hunt Valley, Maryland, and with substantial production and research and development operations located in Wixom, Michigan.  For purposes of diversity jurisdiction, the members of Nivalis are citizens of Florida and Maryland. Nivalis' business includes the development and production of electric automotive battery systems for use in cold storage transportation vehicles (refrigerated truck trailers).

7.    Townsend Capital is a limited liability corporation organized under the laws of the State of Delaware, with its principal place of business located in Hunt Valley, Maryland.  For purposes of diversity jurisdiction, the members of Townsend Capital are citizens of Florida and Maryland. Townsend Capital is a private equity investment operating company and an affiliate of Nivalis Energy Systems. Townsend Capital provides Nivalis with staffing and back-office services.

8.      LGES is a South Korean corporation with a principal place of business in Seoul, South Korea.  LGES is one of the world's largest manufacturers of batteries and energy storage systems.  LGES is a global enterprise with subsidiaries and joint ventures located in major markets around the world.  LGES has wholly owned U.S. subsidiaries located in Michigan, Arizona, and Massachusetts, as well as joint manufacturing ventures with three automakers to produce electric vehicle batteries at plants in Ohio, Tennessee, Michigan, and Georgia.

### III.   STATEMENT OF FACTS

**A.    MEB Cells, Modules, and Battery Packs.**

9.      The MEB module is a lithium-ion battery manufactured by Defendant LGES for use in automotive applications.  The MEB module was originally manufactured by LG Chem ("LGC") prior to the spinoff of LGES as a separate business entity in 2020.

10.     The MEB module is marketed under the LGES "E78" product line. E78 is a reference to the module having a capacity of 78 ampere hours (Ah), meaning that it can provide 78 amps of current for one hour.

11.     The MEB module was developed by LGC and LGES for use in electric vehicles manufactured by Volkswagen under its "Modular Electric Drive Matrix" technological platform.

12.     A completed MEB battery pack contains multiple modules, the number of which depends on the intended usage and application of the battery pack.  Each module is comprised in turn of multiple cells, with the number of cells per module varying based on the use and application of the battery.  Nivalis' battery pack was designed to use MEB modules with each module containing 24 cells.  Nivalis designed a low-voltage battery pack that would use 16 MEB modules connected in a parallel circuit.  In a parallel circuit, all of the modules' positive terminals are connected on one side and all of the negative terminals are connected on the other.  Later, Nivalis also designed a high-voltage battery pack that would use 20 MEB modules configured in two series of 10 MEB modules each.  A series configuration means that, within the series of ten modules, the positive terminal of one module is connected to the negative terminal of the next module.

13.     Like many lithium-ion batteries, the cells within an MEB module contain anodes that are made from graphite.  The individual cells in an MEB module are also encased in, and protected by, a barrier known as the "cell pouch."  The cell pouch also contains the electrolyte that functions as a catalyst for the movement of ions between the anode and cathode.  The cell pouch consists of three layers.  The innermost layer is made from polypropylene, which facilitates heat sealing and protects the cell pouch's core central layer of aluminum from corrosion and degradation by the electrolyte.  The outermost layer is made from PET (a polyester)

5

and nylon (a polyamide), which provides structural reinforcement and protection. Degradation of the cell pouch can cause the cell to emit gas or leak electrolyte, causing potentially serious safety and functionality consequences.

14. MEB modules within a battery pack are connected by small metal mechanisms known as busbars.

15. A completed MEB battery pack also contains a battery management system ("BMS") that provides thermal regulation of the modules.

16. Some battery systems also incorporate detection sensors to identify when individual battery cells begin to vent flammable gases or leak electrolyte. These sensors identify the risk of dangerous cell deterioration which could otherwise lead to "thermal runaway" in the battery pack by causing a system shutdown when certain thresholds are reached. Identification of the risk allows for prompt mitigation and reduction of the possibility of harm to persons or property. But the need for stricter detection thresholds can have a significant impact on the commercial viability of a battery pack design due to the added cost of more sophisticated sensor equipment and the increased possibility of a system shutdown triggered at lower thresholds.

**B.     The Nivalis E-Reefer Development Project.**

17. In 2020, Plaintiff Townsend Capital reorganized its relationship with the existing battery technology company AllCell Technologies and began servicing

6

Nivalis, a new entity, in its efforts to develop larger scale production of battery systems.  As part of Nivalis' focus on scaling up production, it moved into a new production and operations facility in Wixom, Michigan.

18.     One of Nivalis' key first projects was the design and development of battery-powered refrigerated truck trailers for use in cold storage logistics.  These refrigerated truck trailers are colloquially referred to as "reefers," and Nivalis refers to its electric version as an "E-Reefer."

19.     Trucking companies in the United States currently have approximately half a million reefers in operation, which are typically managed through large logistics or leasing companies.  Refrigeration is provided by on-board systems called truck refrigeration units ("TRUs").  TRUs are typically powered by small, inefficient diesel engines with systems that cause significant air pollution.

20.     Because of the perishable nature of goods being transported in reefers, the market demands that TRUs provide consistent and reliable thermoregulation. Refrigeration units with a known excessive risk of potential failure would be unacceptable to cold storage logistics enterprises, as such failures could expose them to catastrophic liability and loss of customer good will.

21.     As it was then envisioned, Nivalis' E-Reefer project called for eliminating diesel refrigeration units and replacing them with an electric system powered by a lithium-ion battery pack.  The E-Reefer battery pack was originally

designed around a 44-volt system architecture and was to have been made up of 16 MEB modules in a parallel circuit with the required BMS, safety controls, and enclosure. Nivalis subsequently designed a high-voltage E-Reefer battery pack around a 350-volt system architecture and 20 MEB modules in two series configurations.

**C.     Nivalis' Purchase of LGES B-Grade Modules and Extended Negotiations to Obtain Necessary Warranty Protection.**

22.     At some point prior to March 2021, a tranche of MEB modules sold by LGC/LGES to Volkswagen were rejected by the auto manufacturer upon delivery because of significant product defects.

23.     The MEB modules that Volkswagen rejected were manufactured and shipped from the LGC/LGES subsidiary in Poland, which is today known as LG Energy Solution Wroclaw Energy Sp. z o.o. ("LGES Wroclaw").

24.     In June 2021, LGES informed Nivalis that Volkswagen had rejected the shipment because of "scratch/crack on the surface" of the MEB cells. It was not until two years later, following many inquiries from Nivalis, that LGES finally confirmed in May 2023 that the rejected MEB modules included cells with cracks in the *aluminum layer of the cell pouch*. These cracks resulted from mechanical damage during the cell production process at the LGES Wroclaw manufacturing facility that was caused by a defective production tray.

8

25. In late 2020, LGES began trying to find an alternate buyer for the modules rejected by Volkswagen, which it labeled and referred to as "B-grade" modules. It referred to comparable modules with no cell pouch cracks as "A-grade" modules. While not initially known to Nivalis, LGES was aware that B-grade modules carried the risk of electrolyte leakage from cells or accelerated degradation of the cells in high temperature conditions.

26. On March 18, 2021, Nivalis and LGES initiated discussions about Nivalis' potential purchase of battery modules from LGES. As part of the initial discussions, LGES provided Nivalis with a confidential presentation document regarding the B-grade modules entitled "Usage condition & Guide of LGC MEB 590 Module." This document was dated November 23, 2020. At the time, Nivalis was not aware that the B-grade modules carried a significant risk of potential cracks to the cell pouch that could lead to safety hazards.

27. According to the November 23, 2020 presentation, the B-grade modules came with certain associated requirements depending on whether the module was going to be used in a low- or high-voltage system. Specifically, in low-voltage applications (less than or equal to 60 volts direct current) the busbars between B-grade modules would not need to be insulated, but in high-voltage applications (450 to 800 volts), the busbars would require an "insulation cap." An insulation cap surrounds the busbar and is typically made from silicone. The

9

addition of busbar insulation caps would cause a marked increase to the research, design, and production costs of a completed battery pack.

28.     The November 23, 2020 presentation also represented that "an essential application condition" for systems using B-grade modules was the installation of gas detection sensors capable of "detect[ing] Cell Venting Gas."  LGES recommended one gas detector designed to detect carbon dioxide and one gas detector designed to detect volatile organic compounds.  The presentation noted that neither gas detector was designed to detect electrolyte leakage.

29.     LGES informed Nivalis that the conditions set forth in the November 23, 2020 presentation document were required if Nivalis wanted LGES to stand behind a warranty for the MEB modules once Nivalis utilized them and sold them to end users of its battery packs.  Both parties well understood that Nivalis would need LGES to provide a warranty for the MEB modules in order for any sales to end users to be commercially viable.

30.     Other warranty conditions set forth in the presentation were that:  the battery pack would have a cooling system capable of keeping the modules to an operating temperature between -30 and +55 degrees centigrade and a storage temperature between -40 and +70 degrees centigrade, and that the pack would incorporate an "enhanced insulation resistance detect function" into its BMS, in accordance with the separately provided "Design Guide for Isolation System."

*Insulation* is a safety barrier of material between low- and high-voltage systems that creates *isolation* between the two.  Isolation of low- and high-voltage systems serves a critical safety function and promotes longevity of the modules.

31.     On March 23, 2021, Nivalis' then-Vice President of Manufacturing, Scott Morehouse, sent a letter to Jong Seok Lee, an Account Manager for LGES on its New Application—Advanced Automotive Battery team.  The letter was sent on Nivalis letterhead, which listed the company's Wixom, Michigan address, and was sent to LGES' business address in Seoul, South Korea.  Nivalis provided the letter as "a non-binding letter of intent to be used as a basis of discussion between the parties."  It articulated Nivalis' intent to purchase 56,000 MEB B-grade modules at a price of $130 per kilowatt hour with a target delivery of 2021–22.  The letter also set forth Nivalis' intent to order approximately 50 MEB modules for the purposes of preproduction testing and engineering development.

32.     On March 31, 2021, LGES provided Nivalis with the "LG Design Guide for Isolation System" referenced in paragraph 30 above.

33.     On May 12, 2021, representatives of LGES and Nivalis met in person. Attending from LGES were Jong Seok Lee, Jinyoung Park, and Taegul Kang. During the meeting, Nivalis provided an overview of the company, its locations, its key ventures, and its ownership relationship to Plaintiff Townsend Capital.  Nivalis also outlined its proposed use of the B-grade MEB modules as part of its E-Reefer

project, including detailed information about the refrigeration system, battery design concept, and 44-volt system architecture.

34.   After the in-person meeting, Mr. Morehouse and Mr. Lee exchanged emails on behalf of their respective organizations.  Mr. Morehouse sent LGES a detailed summary of specifications for the planned application of the MEB modules in the E-Reefer project.

35.   In a May 29, 2021 email, Mr. Morehouse provided Nivalis' production timeline, which envisioned 16 weeks for module testing after the MEB modules were received from LGES, 12 weeks of subsequent system-level testing, further time for design changes and updates, and a final "approval for production" date of April 12, 2022.  Nivalis set a target date of July 2022 for final delivery of its 44-volt system to fulfill a purchase order it had received for over 300 E-Reefer 44-volt battery packs, which would require over 4,800 MEB modules.

36.   In the same email, Mr. Morehouse asked Mr. Lee "to clarify the status of the modules that are available" in light of LGES' prior representations that suggested the MEB modules had already been manufactured and were being held in storage by LGES.

37.   In a June 3, 2021 email, Mr. Morehouse reaffirmed that Nivalis planned to use the MEB modules for E-Reefer production in November 2021 following one to two months of module testing.  This time estimate was premised on: (1) module

testing data to be compiled by Nivalis and combined with any historical data provided by LGES; (2) Nivalis' receipt of cycle life and warranty estimates from LGES; and (3) Nivalis' receipt of MEB pricing information regarding current- and next-generation MEB modules.

38.     On June 15, 2021, Mr. Lee emailed Mr. Morehouse and Sam Plunkett, who was then a Director of Research and Development of AllCell Technologies, a former Nivalis affiliate, and who presently serves as the Chief Technology Officer at Nivalis.  Therein, Mr. Lee explained for the first time that "the difference between A-grade and B-grade cells are that B-grade cells could have a shorter life cycle compared to A-grade cells" and he requested additional time for LGES to provide testing and analysis specific to the life cycle of the B-grade cells.

39.     The next day, Mr. Lee again emailed Mr. Plunkett and Mr. Morehouse with information that LGES had not previously shared about the B-grade modules. He noted that the B-grade modules "could consist of potential . . . cells which have scratch/crack on the surface, which can affect life-cycle when used [at fast discharge rates] and wide range of temperature for many year."  He stated that the "[p]ortion of these . . . cells are very small (0.76%), but this is why VW refused to accept the whole lot, and we are selling as B-grade."  Notwithstanding this revelation, Mr. Lee went on to say that "we can guarantee the use of these modules up to 5 years if used per the 'LG Usage Guide' shared below – that means for 5 years, we guarantee there

13

will be no performance difference from A grade if used per our guideline."[1]  Mr. Lee also conveyed LGES' belief that the E-Reefer's "mild usage condition can further secure safety and performance of [the MEB modules]."

40.    Additional disclosures from LGES about the B-grade modules followed in a June 21, 2021 email from Mr. Lee to Mr. Plunkett.  Mr. Lee explained that:

> While transporting the cells, some were scratched by tray, and found with very minor crack at corner pouch.  Only the external pouch surface is scratch/crack, so there is no issue with electrodes, separators and other components.  We verified that there is no safety risk, and only potential life-cycle issue when used for many years.  As you know, we guarantee the cells' performance and life-cycle up to 5 years as long as they are used within our guideline.
>
> …
>
> For B-grade cells without scratch/crack, they have identical performance as normal gen1 cells (identical chemical, mechanical, dimension, etc.)  These are basically A-grade cells, only categorized as B-grade because we are unable to sort out the scratch/crack cells among the good ones.

In the body of the email, Mr. Lee included a photograph of a cracked B-grade cell.

41.    Based on the representations contained in Mr. Lee's emails, Nivalis continued testing of the MEB modules and negotiated with LGES in good faith toward an eventual purchase of the B-grade modules.  These negotiations culminated in Mr. Morehouse signing and sending to Messrs. Park and Lee on September 24,

---

[1]    Although some communications referenced a five-year warranty, the parties ultimately agreed that LGES would provide a warranty term of six years on the B-grade modules.

2021 a "non-binding Letter of Commitment to LG Energy Solutions for the purchase of the MEB B-grade modules to be used in the refrigerated truck TRU application." The letter specified that "[e]arly production field trials are scheduled for [later in] 2021 and shall include the purchase of 2000 MEB B-grade modules" and that a base price of $130 per kilowatt hour "ha[d] been agreed upon, with confirmation of the 6-year life guarantee for the TRU duty cycle." The parties agreed to "work in good faith to formalize a definitive supply agreement which will govern complete details for the transactions."

42.     The Letter of Commitment also included the following provision:

> *Separately from the production orders*, Nivalis shall order samples for design confirmation and validation testing. It is further agreed that Nivalis acknowledges and agrees that these 'samples' provided by LGES are provided "AS IS" and that, LGES makes no other warranties, express or implied, and hereby disclaims all implied warranties, including any warranty of merchantability and warranty of fitness for a particular purpose *with respect to the samples*. This agreement shall apply to the 'samples' and *therefore shall not impact the agreed warranty for MEB modules which are ordered for production deliveries*.

(Emphasis supplied.)

43.     The Letter of Commitment was sent on Nivalis letterhead listing the company's Wixom, Michigan business address. It was counter-signed and executed by Mr. Park, Vice President of LG Energy Solution, on September 29, 2021.

44.     On December 23, 2021, Nivalis received a "Prepayment Invoice" on LGES stationery for 2,000 MEB modules at a unit price of $890 each, amounting to

15

a total price of $1,780,000.  The invoice listed the shipper as LGES Wroclaw.  The invoice was billed to Plaintiff Townsend Capital "(c/o Nivalis Energy)" at Townsend Capital's Maryland business address.  The invoice listed Plaintiff Nivalis and its Wixom, Michigan business address as the "Ship-To address," along with Mr. Morehouse's name, Michigan phone number, and email address.  Plaintiffs paid the full amount due on this invoice.

45.     Plaintiffs received proforma invoices indicating that the MEB modules were shipped from Poland in three batches of 400 modules on January 20, 2022, and two batches of 400 modules on January 31, 2022.  The proforma invoices showed a payment date of December 23, 2021 and listed the same entities and addresses as the prepayment invoice for sender, payor, and recipient.

46.     On March 1, 2022, Nivalis issued a Purchase Order to eMatrix Energy Systems, Inc. ("eMatrix"), which had been engaged to assemble the completed battery packs for the E-Reefer production for ten modular battery pack systems at $26,000 per pack.  Nivalis also agreed to pay eMatrix $145,000 for engineering, design, and testing.  The eMatrix purchase order specified that Nivalis would supply 16 MEB modules to eMatrix for use in each battery pack, with units to be completed within 12 weeks.

47.     On April 12, 2022, Nivalis received from LGES a confidential document styled as a "Product Specification" for the LGES E78 rechargeable

lithium-ion battery.  This LGES document was dated October 14, 2021.  The document contained a notice that "[a]nyone involved in the design, use, or manufacture of Battery Pack or BMS with LGES's cells should read and understand this document."  The body of the document described various aspects of the MEB modules.  Under the heading "Appearance," the document explained that "[t]here shall be no such defects as deep scratch, crack, rust, discoloration or leakage which may adversely affect the commercial value of the cell."

48.  The Parties engaged in continuing discussions about warranty protections and viable applications for the B-grade modules throughout 2022 and continuing into 2023.  This included an in-person meeting on April 14, 2022, and a telephone call on May 11, 2022.  Messrs. Lee and Park participated in the call for LGES, and Dennis Townsend, Chairman of both Townsend Capital and Nivalis, and Ryan Kemmet, then a consultant for Nivalis, were on the call for Nivalis.  During the call, Nivalis raised the possibility of two new business applications for battery packs based on the B-grade modules.  Neither application would have used the batteries for "on-road" purposes, but one of them still required traction.  Responding to the proposed use of B-grade modules in a project requiring traction, LGES indicated that it would not extend warranty protection to B-grade modules in such applications.  This was the first time Nivalis was informed of any such limitation on

the use of the B-grade modules, and it effectively precluded Nivalis from developing many possible uses for the modules it had purchased.

49.  Negotiations between the parties over the scope of the LGES warranty were tracked and memorialized through the use of a dynamic "check sheet" of engineering questions.  Mr. Kemmet acted as liaison between Nivalis' engineering team and the LGES representatives during the check sheet process.  Throughout, Nivalis' engineering team continued to raise concerns about the utilization of the B-grade modules.  On June 16, 2022, Mr. Kemmet sent Mr. Lee a message about how to reconcile technical concerns based on an international manufacturing standard.  In his response, Mr. Lee's characterization of the B-grade modules suggested more consequential defects and limitations than LGES had previously revealed:  "Okay. We will have to see if that is applicable to these B grade modules though because of their quality concerns (crack on pouch)."

50.  In a July 24, 2022 email to Mr. Kemmet, LGES articulated additional warranty requirements for the B-grade modules.  LGES' technical lead communicated that extensive isolation diagnosis monitoring would be required in order to detect electrolyte leakage from the cracked cells.  Specifically, LGES communicated that the isolation guidelines requiring the addition of a monitoring device that it had previously provided, which referenced direct current voltages of 60 volts or greater, would now also be imposed for applications below 60 volts.

Because Nivalis' low-voltage system used a parallel circuit, this isolation requirement would have obligated it to add one monitoring device per module and consequently had the effect of rendering use of the B-grade modules not economically viable for the 44-volt E-Reefer project—the exact application of the B-grade modules that had been the subject of the parties' extensive discussions and negotiations up to that point.[2]

51.     By late August 2022, the check sheet process had already extended far past Nivalis' expectation.   Nevertheless, on August 31, 2022, LGES raised an entirely new warranty requirement.   While LGES had previously indicated that the B-grade modules required gas detection, before and after Nivalis' purchase of 2,000 B-grade modules in December 2021, it had represented that gas detection was needed for "cell venting" and could be addressed with sensors for carbon dioxide and volatile organic compounds.   For the first time in a check sheet entry, LGES indicated that gas detection was needed for *electrolyte leakage* and additional sensors would be required to disable the battery pack at a threshold of *total* volatile organic compounds ("TVOC") of 20 parts per million.

52.     Up until September 2022, Nivalis had no intention of developing a high-voltage product offering, and 100 percent of its production and anticipated

---

[2]     By contrast, because the high-voltage system used a series configuration, Nivalis would only need to install one monitoring device per series, equivalent to one monitoring device per ten modules.

revenues was attributable to low-voltage products.  To this day, low-voltage products remain a significant component of Nivalis' overall long-term business, and Nivalis intends that this will remain the case going forward.  Nivalis purchased the B-grade modules in December 2021 solely for the low-voltage E-Reefer battery pack.

53.     In light of the constraints revealed by LGES during the check sheet process with respect to the use of B-grade modules for low-voltage applications, Nivalis made a good-faith effort to find alternative uses for the B-grade modules by pivoting to its high-voltage E-Reefer battery pack design that would operate on a 350-volt system architecture rather than the originally envisioned 44-volt system.  To carry out this project, Nivalis and LGES began discussions for Nivalis to purchase an additional 3,000 B-grade modules for delivery in late 2022.

54.     On October 11, 2022, LGES Wroclaw issued Nivalis a price quotation for the purchase of 3,000 additional B-grade modules at a unit price of $890.50, for a total cost of $2,671,500.  On November 4, 2022, Mr. Kemmet sent LGES Wroclaw a purchase order for 3,000 additional B-grade modules on these terms.  Both documents listed the place of delivery as a Nivalis warehouse in Rochester Hills, Michigan.

55.     In an exchange of emails also on November 4, 2022, Mr. Lee requested that Nivalis waive the 3,000 B-grade modules' nonconformity with design specifications with respect to cell/module voltage, exterior appearance, and

insulation resistance.  Mr. Lee stated that "[m]ain reason for the above request is due to long-term storage period of the modules at [Nivalis'] external warehouse" and "[d]ue to such long-term storage and lack of monitoring, [LGES is] afraid the cell/module performance could fall."  Mr. Kemmet agreed to waive the module/cell voltage and exterior appearance nonconformities but asked for clarification on what was a potentially new nonconformity with respect to insulation resistance.

56.     On November 8, 2022, Mr. Lee emailed Mr. Kemmet, stating that the B-grade modules used in high-voltage applications would be covered by a six-year warranty, so long as Nivalis could ensure that such E-Reefer battery packs would be "operated under similar environment" to the low-voltage battery packs.  To that end, Mr. Lee requested Nivalis to confirm "any major differences in the usage environment and system" between the low- and high-voltage battery packs.

57.     Contemporaneously, in the fall of 2022, the parties were negotiating over the terms of a more comprehensive, long-term supply agreement for future MEB modules to be used in Nivalis' E-Reefer applications.  This agreement did not apply to the 5,000 MEB B-grade modules that Nivalis had already purchased.  While the parties engaged in extensive negotiations and exchanged several draft agreements, no final agreement was ever executed.  In furtherance of the supply agreement negotiations, Mr. Lee met with Mr. Townsend and Mr. Kemmet for two full days between November 15 and 18, 2022.

58.     On November 29, 2022, Nivalis wired a payment to LGES Wroclaw that included the $2,671,500 cost of the 3,000 additional B-grade modules.   On February 14, 2023, Nivalis received the 3,000 additional B-grade modules, which were shipped from LGES Wroclaw.

59.     In ongoing check sheet discussions for the high-voltage application, on January 18, 2023, LGES inserted yet another new requirement for its issuance of the necessary warranty protections.  Under a new check sheet heading titled "Insulation diagnosis," LGES "propose[d] to set fault detection level from 255kohm to over 400kohm . . . for preventing potential failure by condensation or [electrolyte] leakage[.]"  In plain terms, LGES sought to impose a lower, and thus more sensitive, isolation threshold, and it sought to do so in order to detect potential electrolyte leakage from the cracked cells.

60.     The extended check sheet discussions seemingly caused confusion on the LGES side.  In one exchange between Mr. Lee and Mr. Kemmet on January 24, 2023, Mr. Lee wrote:  "Can't we use the modules for [low-voltage] application but just have the pack isolated from the chassis so it can satisfy the checksheet?"  Mr. Kemmet replied:  "Correct but no low voltage applications are isolated systems."  Mr. Lee replied:  "I see.  So you expect consumption of the [B-grade] crack modules will be pushed out to 2025?  If we cannot find that other application for the b grade modules."  Mr. Kemmet expressed skepticism:  "Can they still be used at that point?

Does that effect warranty?  And it would be hard for us to want to purchase 6 yr warranty batteries for nearly same cost as 12 yr warranty batteries."

61.     Mr. Kemmet subsequently met with Mr. Lee and two other members of the LGES team to address these and other ongoing concerns on March 2, 2023.  Mr. Kemmet asked several questions about the warranty and quality concerns with the B-grade modules.  Mr. Lee agreed to look into whether LGES would be willing to offer additional warranties on the B-grade modules.  The LGES team also shared new information about the B-grade modules and the effect of the cell cracks.  Specifically, LGES informed Nivalis that electrolyte leakage or a faulty seal was present in only two percent of the B-grade modules, but that LGES had opted not to incur the cost of identifying which cells in which modules presented this potential issue.  Instead, LGES had decided to simply offer all of the potentially affected modules for sale as B-grade modules.

62.     LGES' continuing disclosures about issues with the B-grade modules led Nivalis to request that LGES furnish it with additional information about internal testing, defects, and known failure mechanisms for the B-grade modules as compared to LGES A-grade modules.  In an April 10, 2023 email to Mr. Lee, Mr. Kemmet wrote:  "We have heard these referred to as 'cracked' or leaking and we would like to understand what specifically that refers to and what are the known

failure rates (what percentage of units is known failures and if this is on the cell or module level) and known failure mechanisms."

63.   In response to Nivalis' request for more detailed information with respect to the B-grade modules, LGES provided two reports.  The first report, produced on April 20, 2023, included a summary of test results on the B-grade modules and further details about safety issues with the modules.  That report defined B-grade modules as "modules that are within the risk-range of containing one or more pouch crack cells" and stated that the risks associated with B-grade modules were that cells could potentially experience electrolyte leakage or accelerated degradation but only in extreme conditions.  The cracks in the cell pouch could lead to these risks in one of two ways:  (1) corrosion of the aluminum pouch and increase of the crack size caused by intrusion of hydrofluoric acid (created from water and electrolyte), or (2) complete cell breakage caused by cycles of cell swelling.

64.   In the report, LGES also represented that, based on its cell sampling test, the cell-level failure rate in B-grade modules was 2.1 percent.  Its cell-level testing showed electrolyte leakage in cracked cells at 60 degrees centigrade and 85 percent relative humidity after 49 days, while normal cells showed no electrolyte leakage under those conditions but did show leakage at 70 degrees centigrade and 95 percent relative humidity after 24 days.  LGES also ran *module-level* tests on the

B-grade modules.  These showed no electrolyte leakage in either A- or B-grade modules at 60 degrees centigrade, but did show electrolyte leakage in B-grade modules at 70 degrees centigrade after 26 days, whereas A-grade modules showed no leakage under the 70-degree condition.  Module-level testing also showed an increase in crack size in the B-grade modules when exposed to constant heat and high humidity for 44 days.  Under these conditions, small cracks increased by an average of 25 percent in length over the course of the testing period, and large cracks increased by an average of 20 percent over the same period.  These findings were significant because they showed that crack size—and thus the cell-failure rate— would increase as the cells aged.  Accordingly, the failure rate over the *life span* of the cells, which was many times longer than the testing period, would be exponentially greater than LGES' 2.1 percent calculation.

65.    The report's overall conclusions were that:

Although labeled as B-grade, most of the modules are normal inventory, only classified as B-grade due to the difficulty to filter out small portion of Pouch crack cells (2.1%) within the production batch that have been already assembled into modules.

. . .  [C]onsidering that [electrolyte] leakage occurs even in normal products . . ., it shouldn't be taken that Pouch crack is the reason for [electrolyte] leakage itself.

LG test result indicates that by applying cooling system and [proper enclosure], which LG has presented as essential conditions for use, the likelihood of such risk becomes significantly lower.  Furthermore, even in extreme cases where [electrolyte] leakage or venting occurs, secondary safety measures such as the "Design Guide for Isolation

System" BMS logic and gas sensors can detect issues early on, so the probability of a safety risk occurring is predicted to be very low in real-life situations, which take into account the possibility of such extreme conditions.

66.     One month later, on May 29, 2023, LGES produced its second report. This report expanded on the previous disclosures about the cell crack issue in the B-grade modules.  It explained that B-grade modules fell into two lots of about 54,000 modules with an overall cell-level failure rate of 2.1 percent:  a "low risk" lot of about 45,000 modules with a cell-level failure rate of 0.76 percent and small cracks less than 0.95 millimeters long; and a "high risk" lot of about 9,000 modules with a cell-level failure rate of 8.39 percent. Within the high risk lot, 2.36 percent of cells had a large crack more than 0.95 millimeters long, while 6.03 percent had a small crack.  LGES' cell-level testing was based on a sample of 432,220 cells out of 2,030,021 total cells.  Additionally, LGES' designation of the high and low risk lots reflects that the risk of cell failure is proportional to the size of the cell cracks. Nivalis had not previously been informed about the existence of low and high risk lots of B-grade modules.

67.     The second report also described the nature of the cell cracking in greater detail.  With reference to the fact that cells in an MEB module are protected by a "cell pouch" formed of three layers made of polypropylene, aluminum, and a PET/nylon material, LGES revealed that the cell cracks in the B-modules occurred at the middle aluminum layer of the cell pouch, rather than being a "scratch/crack

on the surface." This was significant because a surface "scratch/crack" would have only negatively affected the modules' useable lifespan, while a crack on the aluminum layer of the cell pouch would allow for rapid degradation of the cells with serious safety and functionality consequences. LGES' second report explained that cracks at the aluminum layer caused the polypropylene and PET/nylon layers to bend but did not lead to any cracking in those layers. LGES identified the "root cause" of the cell pouch cracking as "mechanical damage during cell production (transportation) by tray" and noted that cracks occurred only in an area of the cell pouch known as the "side cup." LGES also explained how high temperature or high humidity could lead to "crack propagation" and eventual cell failure caused by electrolyte leakage.

68.     Buried in the second report was a damning concession that the overall defect rate in Nivalis' high-voltage E-Reefers would be "much higher" than the 2.1 percent cell-level failure rate "because [Nivalis' battery pack] has 240 cells (24 cells in a module x 20 modules in a pack)." Thus, extrapolating the 2.1 percent cell-level failure rate to the Nivalis high-voltage battery pack would result in a pack-level occurrence rate of 99.996 percent.[3] Astonishingly, the second report averred that

---

[3]     LGES did not provide data that would allow Nivalis to ascertain or extrapolate an overall pack-level *failure* rate. Instead, Nivalis only knows that the occurrence of cell-level failure in each battery pack is statistically a near certainty. Additionally, Nivalis' calculation of a pack-level occurrence rate of 99.996 percent is based on 480 cells per pack. To the extent that LGES' analysis incorporated the arithmetical

this occurrence rate "doesn't necessarily lead to a electrolyte leakage or safety issue" so long as Nivalis constrained use of the battery packs to "mild environmental condition[s.]"

69.     Responding to a question posed by Nivalis, on April 25, 2023, LGES finally explained the full reason that the B-grade modules had been rejected by Volkswagen:

> Modules were rejected from VW due to possibility of faster cell degradation and consequential warranty issue.  Our current warranty terms with Nivalis was determined taking into consideration such cell degradation risk and TRU's usage pattern (which is much mild [sic] than a passenger car), so it doesn't risk Nivalis warranty.  Crack issue was identified shortly after some shipment has been [sic] made to VW.

70.     The two LGES reports about the B-grade modules introduced considerable new concerns for Nivalis about the commercial viability of the modules it had purchased to be used in Nivalis' E-Reefer battery pack project.  After further review and validation of the information in the reports, Mr. Townsend, as Chairman of Nivalis, issued a letter to LGES on September 4, 2023 ("Townsend letter").  In the letter, Mr. Townsend informed LGES that Nivalis was unable to integrate the 5,000 B-grade modules it had purchased (2,000 in December 2021; 3,000 in November 2022) into Nivalis battery packs for sale to customers.  Mr. Townsend

---

error included in the body of the report (24 cells x 20 modules = 240 cells per pack), the cell-level failure rate would have been even higher than 2.1 percent and, consequently, the pack-level occurrence rate would have also been higher.

explained that the B-grade modules were "not commercially viable due to unacceptable safety risk, unmanageable return merchandise costs, increased integration costs, and reduced usage conditions" and requested LGES' engagement in discussions about "the return or disposition of the Grade B modules in a safe manner and determin[ing] a path forward with [LGES] to replace or compensate Nivalis for Grade B Modules."

71.    The Townsend letter provided four reasons that the 5,000 B-grade modules purchased by Nivalis had no commercial value:

      a.  First, Mr. Townsend explained that the first tranche of 2,000 MEB modules had been procured precisely for use in Nivalis' *low-voltage* E-Reefer battery pack—a use that was well known to LGES long before the first purchase was consummated. The extensive isolation detection requirements imposed by LGES in July 2022 would have required Nivalis to design its low-voltage battery packs with significant additional detection hardware that was economically prohibitive.

      b.  Second, Mr. Townsend explained that LGES imposed new and onerous battery pack requirements like TVOC sensors, a more protective enclosure, and liquid cooling well after the first tranche of B-grade MEB modules was purchased and delivered. He noted

that the TVOC sensors created risks of system shutdowns, and, taken together, the new requirements would dramatically increase the development and manufacturing costs of using the B-grade modules in Nivalis' high-voltage battery pack without actually mitigating the risk of electrolyte leakage.

c. Third, Mr. Townsend pointed out that the information in LGES' two reports in spring 2023 correlated to a crack occurrence rate in Nivalis' high-voltage battery pack of 99.996 percent.  Even where a module was covered under LGES' warranty, Mr. Townsend explained that the nearly one hundred percent crack occurrence rate introduced economically unfeasible time, cost, and logistics associated with repairing faulty battery packs.  Furthermore, Mr. Townsend pointed out that battery pack failure was uniquely unacceptable in the cold storage logistics industry given the risk of merchandise loss and significant down time for repair.   Mr. Townsend also noted that the high-risk of potential battery pack failure would have catastrophic effects on Nivalis' industry reputation and goodwill.

d. Fourth, Mr. Townsend underscored that the B-grade modules pose unacceptable safety risks due to potential leakage of highly

flammable liquid or gas.  He noted further that Nivalis would be obligated to disclose the specific safety risks associated with a battery pack containing B-grade modules, which would make Nivalis' E-Reefer battery pack commercially unattractive to customers seeking a safe and reliable product.

72.     On September 28, 2023, LGES provided its first response to the Townsend letter by way of an email from Mr. Lee.  Notwithstanding the findings of the two reports and Nivalis' analysis in the Townsend letter, LGES continued to assert that cells in the B-grade modules were "only damaged on the exterior" and that LGES could "safely say that the safety risks of B-grade cells [we]re close to normal cells."  On this basis, LGES rejected Nivalis' request for replacement or compensation related to the B-grade modules but agreed to continue discussions with Nivalis to resolve the matter.

73.     Several months passed before LGES again addressed the matters set forth in the Townsend letter with an email from Mr. Lee on February 19, 2024.  Mr. Lee disclaimed LGES' responsibility for the B-grade module issues, stating:  "We have clearly conveyed the message several times since the beginning of our business that B grade modules need safety measures applied, verified that safety risk is unrealistic in real-life situation if used under our guidelines . . ., and offered a special price . . . to compensate for such inconvenience."  Notwithstanding that position,

LGES agreed to negotiate to compensate Nivalis for a portion of its losses from the B-grade purchases through an offer of discounted prices on the future sale of A-grade modules.

74.     On February 22, 2024, Mr. Plunkett responded on behalf of Nivalis, reiterating Nivalis' position that both tranches of the 5,000 B-grade modules were purchased before receiving relevant information indicating a 2.1 percent cell crack rate and that Nivalis should not bear the replacement cost of the B-grade modules owing to critical information that had not been disclosed until after the purchases. Although Nivalis had previously requested a direct replacement of the first 2,000 B-grade modules and a credit for the remaining 3,000, Mr. Plunkett made a counterproposal to Mr. Lee's offer of a discount on future purchases that would compensate Nivalis commensurate with a refund of all 5,000 B-grade modules and certain related costs.

75.     The parties continued to negotiate in good faith to resolve Nivalis' claim for the B-grade modules through discounted pricing and/or preferential sales terms throughout the spring and summer of 2024.  These negotiations were ultimately not fruitful, and in early September 2024, Nivalis informed LGES that it would fulfill its future battery module needs through an alternative supplier.

76.    Because Nivalis' damages from its purchase of the defective B-grade modules cannot be recovered through offsets on future LGES purchases, Nivalis brings the present civil action for declaratory relief and compensatory damages.

## IV.    JURISDICTION AND VENUE

77.    This Court has subject matter jurisdiction over the claims in this action because they arise under the United Nations Convention on Contracts for the International Sale of Goods ("CISG"), a treaty signed by the President and ratified by the Senate in 1986.  *See* 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under . . . treaties of the United States.").

78.    The CISG "applies to contracts of sale of goods between parties whose places of business are in different States . . . when the States are Contracting States." CISG, art. 1(1)(a).  The CISG is a self-executing treaty that creates a private right of action in the courts of the United States.  *Delchi Carrier v. Rotorex Corp.*, 71 F.3d 1024, 1027–28 (2d Cir. 1995); *BP Oil Int'l, Ltd. v. Empresa Estatal Petroleos de Ecuador*, 332 F.3d 333, 337 (5th Cir. 2003) ("As incorporated federal law, the CISG governs the dispute so long as the parties have not elected to exclude its application.").  Under the Supremacy Clause, the CISG preempts contrary state contract law, including the Uniform Commercial Code.  *Chilean Sea Bass Inc. v. Kendell Seafood Imports*, -- F. Supp. 3d --, 2024 WL 2324621, at *12 (D.R.I. 2024).

79.    The CISG applies to the contract claims in this civil action because the parties entered into written and oral contracts for the international sale of goods and made no provision to exclude or limit the application of the CISG. *See* CISG, art. 6 (affording parties right to exclude or limit application of the CISG by contract). Nor is application of the CISG excluded by any of the treaty's specific exclusions. *See* CISG, arts. 2–5. Furthermore, South Korea and the United States are both state parties to the CISG with no relevant reservations or declarations that would limit the applicability of the CISG to this dispute. *See* UNCITRAL, Status: United Nations Convention on Contracts for the International Sale of Goods (Vienna, 1980), https://uncitral.un.org/en/texts/salegoods/conventions/sale_of_goods/cisg/status.

80.    This Court has subject matter jurisdiction over all other claims in this action because the amount in controversy exceeds $75,000 and the action is between citizens of the United States and a citizen of a foreign state. *See* 28 U.S.C. §1332(a)(2).

81.    This Court has personal jurisdiction over LGES because it has engaged in business transactions and related activities in Michigan that give rise to the claims at issue. Under Michigan's long-arm statute, "a sufficient basis of jurisdiction to enable the courts of record of [Michigan] to exercise limited personal jurisdiction" over a corporation exists where the corporation has certain relationships with Michigan, including "the transaction of any business within the state" and "entering

into a contract . . . for materials to be furnished in the state by the defendant."  Mich. Comp. Laws § 600.715(1), (5).  "When a 'defendant conduct[s] even the slightest act of business in Michigan,' a sufficient transaction of business occurs under § 600.715(1)."  *Sullivan v. LG Chem, Ltd.*, 79 F.4th 651, 667 (6th Cir. 2023) (quoting *Lanier v. Am. Bd. of Endodontics*, 843 F.2d 901, 906 (6th Cir. 1988)).  The defendant's shipments of batteries into Michigan pursuant to two supply contracts satisfy section 600.715(1).  *Id.*

82.     The exercise of specific personal jurisdiction over LGES also comports with constitutional due process.  LGES purposefully availed itself of the privilege of doing business in Michigan by accepting and fulfilling commercial supply purchase orders for delivery of MEB modules to the Plaintiffs' facilities in Wixom, Michigan.  In *Sullivan*, the Court of Appeals for the Sixth Circuit recently held that LGES' previous parent company, LGC, purposefully availed itself of Michigan law by its direct shipments of batteries into the state.  *Id.* at 671.  Even were that precedent not so clear, the yearslong relationship between Nivalis and LGES involved multiple, clear indications that LGES was availing itself of the laws of Michigan.  Because the claims in the present civil action arise out of or relate to the defendant's aforementioned contacts with Michigan, *see Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 362 (2021), subjecting LGES to specific personal jurisdiction in Michigan would not offend traditional notions of fair play and

35

substantial justice, within the meaning of *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

83.    LGES is a foreign corporation.  Under 28 U.S.C. § 1391(c)(3), venue is therefore proper in this district, as it would be in any other judicial district of the United States.

## V.    CLAIMS FOR RELIEF

### COUNT ONE – DECLARATORY JUDGMENT AS TO DECEMBER 2021 PURCHASE

84.    The Plaintiffs adopt and incorporate by reference each of the foregoing paragraphs as if fully set forth herein.

85.    By their words and actions, the parties entered into a contract for the international sale of goods.  *See* CISG arts. 11, 14, 23.  This contract provided for Plaintiffs' purchase of 2,000 B-grade MEB modules from Defendant LGES and supplied by its subsidiary LGES Wroclaw.  This contract for the purchase and sale of goods was formed upon the Plaintiffs' payment for the goods in December 2021 and acceptance of those goods at Nivalis' Wixom, Michigan location in early 2022.

86.    Under this contract, Defendant had an obligation, implied in law and not otherwise disclaimed, to provide MEB modules that were fit for their ordinary purpose.  *See* CISG, art. 35(2)(a).

87.    Under this contract, Defendant had a further obligation, implied in law and not otherwise disclaimed, to provide MEB modules that were fit for Nivalis'

36

particular purpose, which was well known to LGES at all relevant times, including when the parties entered into a purchase order for the delivery of the MEB modules. *See* CISG, art. 35(2)(b).

88.    The 2,000 MEB modules purchased by Plaintiffs were unfit for the particular purpose for which they were purchased, namely, a low-voltage electric refrigeration system for cold storage logistics.  Moreover, the 2,000 MEB modules also proved to be unfit for a particular purpose for which they were *not* purchased, but to which the Plaintiffs in good faith sought to apply them; namely, a high-voltage electric refrigeration system for cold storage logistics.

89.    The 2,000 MEB modules purchased by Plaintiffs were also unfit for their ordinary purpose—to which Nivalis alternatively proposed to put them—namely, on-road electric automotive applications, as evidenced by the fact that these modules had been rejected by a previous automotive buyer and the Defendant's own admission, made long after the purchase, that they were unsuitable for on-road applications requiring traction.

90.    Defendant LGES is liable for the MEB modules' lack of conformity with their intended ordinary or particular purposes.  *See* CISG, art. 36.

91.    The Defendant's failure to provide goods fit for their ordinary purpose resulted in a detriment to Plaintiffs that substantially deprived them of their reasonable expectations under the contract, and such a result was not reasonably

foreseeable to Plaintiffs.  This amounts to a fundamental breach of contract and the Plaintiffs are therefore entitled to declare this contract avoided under the CISG, notwithstanding the prior delivery of the goods.  *See* CISG, arts. 25, 49(1)(a).

92.     The Defendant's failure to provide goods fit for Plaintiffs' particular, known purposes resulted in a detriment to Plaintiffs that substantially deprived them of their reasonable expectations under the contract, and such a result was not reasonably foreseeable to Plaintiffs. This amounts to a fundamental breach of contract and the Plaintiffs are therefore entitled to declare this contract avoided under the CISG, notwithstanding the prior delivery of the goods.  *See* CISG, arts. 25, 49(1)(a).

93.     Within a reasonable time after discovering Defendant's breach, Nivalis dispatched the Townsend letter to LGES, informing LGES that the MEB modules did not conform to their ordinary or particular purposes and requesting replacement or other disposition of the modules.  In doing so, Plaintiffs effectively declared their avoidance of the contract in accordance with the CISG.  *See* CISG, art. 49(2)(b)(i).

WHEREFORE, Plaintiffs are entitled to declaratory relief and a judgment in the form of an order that declares that Plaintiffs have, pursuant to the CISG, avoided their commercial sales contract with Defendant for 2,000 MEB modules.

## COUNT TWO – AVOIDANCE DAMAGES AS TO DECEMBER 2021 PURCHASE

94.     The Plaintiffs adopt and incorporate by reference each of the foregoing paragraphs as if fully set forth herein.

95.     The Plaintiffs, having duly declared their avoidance of the contract for the December 2021 purchase of 2,000 MEB modules, seek an award of all damages recoverable under the contract and CISG, including restitution, prejudgment interest from the date of the breach, lost profits, attorneys' fees, and all such further damages to which they are entitled as may be proven at trial. *See* CISG, arts. 74, 76, 81, 84(1).

WHEREFORE, Plaintiffs are entitled to judgment against Defendant, consisting of an award of compensatory damages in an amount to be determined at trial, an award of Plaintiffs' attorneys' fees and costs, pre- and post-judgment interest at the legal rate, and such other relief as this Court deems just and proper.

## COUNT THREE – BREACH OF CONTRACT AS TO DECEMBER 2021 PURCHASE

96.     The Plaintiffs adopt and incorporate by reference each of the foregoing paragraphs as if fully set forth herein.

97.     Regardless of whether the parties' contract for the purchase of 2,000 MEB modules in December 2021 has been effectively avoided under the CISG, the Defendant has nevertheless breached that contract for the reasons set forth in paragraphs 85 to 93 of this Complaint.

98.     Defendant LGES is therefore liable for contractual and consequential damages, including lost profits and attorneys' fees, to the full extent to be proven at trial.  *See* CISG, art. 74.

WHEREFORE, Plaintiffs are entitled to judgment against Defendant, consisting of an award of compensatory damages in an amount to be determined at trial, an award of Plaintiffs' attorneys' fees and costs, pre- and post-judgment interest at the legal rate, and such other relief as this Court deems just and proper.

## COUNT FOUR – DECLARATORY JUDGMENT AS TO NOVEMBER 2022 PURCHASE

99.     The Plaintiffs adopt and incorporate by reference each of the foregoing paragraphs as if fully set forth herein.

100.    By their words and actions, the parties entered into a contract for the international sale of goods.  *See* CISG arts. 11, 14, 23.  This contract provided for Plaintiffs' purchase of 3,000 B-grade MEB modules from Defendant LGES and supplied by its subsidiary LGES Wroclaw.  This contract for the purchase and sale of goods was formed upon the Plaintiffs' payment on November 29, 2022 and acceptance of the goods at Nivalis' Rochester Hills, Michigan warehouse in February 2023.

101.    Under this contract, Defendant had a further obligation, implied in law and not otherwise disclaimed, to provide MEB modules that were fit for Nivalis' particular purpose, which was well known to LGES at all relevant times, including

40

when the parties entered into a purchase order for the sale and delivery of the MEB modules.  *See* CISG, art. 35(2)(b).

102.    The 3,000 MEB modules purchased by Plaintiffs were unfit for the particular purpose for which they were purchased, namely, a high-voltage electric refrigeration system for cold storage logistics.

103.    Defendant LGES is liable for the MEB modules' lack of conformity with their intended particular purpose.  *See* CISG, art. 36.

104.    The Defendant's failure to provide goods fit for Plaintiffs' known particular purpose resulted in a detriment to Plaintiffs that substantially deprived them of their reasonable expectations under the contract, and such a result was not reasonably foreseeable to the Plaintiffs.  This amounts to a fundamental breach of contract and the Plaintiffs are therefore entitled to declare this contract avoided under the CISG, notwithstanding the prior delivery of the goods.  *See* CISG, arts. 25, 49(1)(a).

105.    Within a reasonable time after discovering the Defendant's breach, Nivalis dispatched the Townsend letter to LGES, informing LGES that the MEB modules did not conform to Nivalis' known particular purpose and requesting replacement or other disposition of the modules.  In doing so, Plaintiffs declared their avoidance of the contract in accordance with the CISG.  *See* CISG, art. 49(2)(b)(i).

WHEREFORE, Plaintiffs are entitled to declaratory relief and judgment in the form of an order that declares that Plaintiffs have, pursuant to the CISG, avoided their commercial sales contract with Defendant for 3,000 MEB modules.

### COUNT FIVE – AVOIDANCE DAMAGES AS TO NOVEMBER 2022 PURCHASE

106.   The Plaintiffs adopt and incorporate by reference each of the foregoing paragraphs as if fully set forth herein.

107.   The Plaintiffs, having duly declared their avoidance of the contract for the November 29, 2022 purchase of 3,000 MEB modules, seek an award of all damages recoverable under the contract and CISG, including restitution, prejudgment interest from the date of the breach, lost profits, attorneys' fees, and all such further damages to which they are entitled as may be proven at trial.  *See* CISG, arts. 74, 76, 81, 84(1).

WHEREFORE, Plaintiffs are entitled to judgment against Defendant, consisting of an award of compensatory damages in an amount to be determined at trial, an award of Plaintiffs' attorneys' fees and costs, pre- and post-judgment interest at the legal rate, and such other relief as this Court deems just and proper.

### COUNT SIX – BREACH OF CONTRACT AS TO NOVEMBER 2022 PURCHASE

108.   The Plaintiffs adopt and incorporate by reference each of the foregoing paragraphs as if fully set forth herein.

109.   Regardless of whether the parties' contract for the purchase of 3,000 MEB modules in November 2022 has been effectively avoided under the CISG, the Defendant has nevertheless breached that contract for the reasons set forth in paragraphs 100 to 105 of this Complaint.

110.   Defendant is therefore liable for contractual and consequential damages, including lost profits and attorneys' fees, to the full extent provable at trial. *See* CISG, art. 74.

WHEREFORE, Plaintiffs are entitled to judgment against Defendant, consisting of an award of compensatory damages in an amount to be determined at trial, an award of Plaintiffs' attorneys' fees and costs, pre- and post-judgment interest at the legal rate, and such other relief as this Court deems just and proper.

## COUNT SEVEN – UNJUST ENRICHMENT AS TO DECEMBER 2021 PURCHASE

111.   The Plaintiffs adopt and incorporate by reference each of the foregoing paragraphs as if fully set forth herein.

112.   In the event that the Court finds that the Plaintiffs and the Defendant did not enter into a binding contract for the purchase and sale of the first 2,000 MEB modules, Plaintiffs make this alternative claim for unjust enrichment against the Defendant.

113.   The Plaintiffs conferred a benefit upon Defendant in December 2021 by paying Defendant the sum of $1,780,000.

114.   This benefit was conferred in consideration for the purchase of 2,000 MEB modules with certain applications and uses having commercial value to the Plaintiffs, which applications and uses were known to the Defendant.

115.   The anticipated valuable applications and uses for the MEB modules were not economically feasible for reasons known to the Defendant but unknown to the Plaintiffs at the time Plaintiffs conferred the benefit of $1,780,000.  In fact, the 2,000 MEB modules have no commercially reasonable value.

116.   Inequity would result if Defendant was allowed to retain the benefit conferred upon LGES by Plaintiffs in exchange for goods that proved to be commercially worthless through no fault of the Plaintiffs.

WHEREFORE, Plaintiffs are entitled to judgment against Defendant, consisting of an award of restitution in the amount of $1,780,000, pre- and post-judgment interest at the legal rate, and any such further relief as equity and good conscience may require.

## COUNT EIGHT – UNJUST ENRICHMENT AS TO NOVEMBER 2022 PURCHASE

117.   The Plaintiffs adopt and incorporate by reference each of the foregoing paragraphs as if fully set forth herein.

118.   In the event that the Court finds that the Plaintiffs and the Defendant did not enter into a binding contract for the purchase and sale of the second 3,000

MEB modules, Plaintiffs make this alternative claim for unjust enrichment against the Defendant.

119.   The Plaintiffs conferred a benefit upon Defendant on November 29, 2022 by paying Defendant the sum of $2,671,500.

120.   This benefit was conferred in consideration for the purchase of 3,000 MEB modules with certain applications and uses having commercial value to the Plaintiffs, which applications and uses were known to the Defendant.

121.   The anticipated valuable applications and uses for the MEB modules were not economically feasible for reasons known to the Defendant but unknown to the Plaintiffs at the time Plaintiffs conferred the benefit of $2,671,500.  In fact, the 3,000 MEB modules have no commercially reasonable value.

122.   Inequity would result if Defendant was allowed to retain the benefit conferred upon LGES by Plaintiffs in exchange for goods that proved to be commercially worthless through no fault of the Plaintiffs.

WHEREFORE, Plaintiffs are entitled to judgment against Defendant, consisting of an award of restitution in the amount of $2,671,500, pre- and post-judgment interest at the legal rate, and any such further relief as equity and good conscience may require.

## Jury Trial Demand

Pursuant to Fed. R. Civ. P. 38 (b), Plaintiffs demand a trial by jury as to any and all issues triable of right by a jury.

Respectfully submitted,

Date:  January 8, 2025                    By: */s/ Amy E. Murphy*
                                                Amy E. Murphy (P82369)
                                                Amanda Rauh-Bieri (P83615)
                                                MILLER JOHNSON
                                                45 Ottawa Ave SW, Suite 1100
                                                Grand Rapids, Michigan 49503
                                                (616) 831-1700
                                                murphya@millerjohnson.com
                                                rauhbieria@millerjohnson.com

                                                and

                                                William J. Murphy (*admission forthcoming*)
                                                Kirk E. MacKinnon Morrow (*admission forthcoming*)
                                                ZUCKERMAN SPAEDER LLP
                                                100 East Pratt Street, Suite 2440
                                                Baltimore, Maryland 21202-14031
                                                (410) 332- 0444
                                                wmurphy@zuckerman.com
                                                kmackinnonmorrow@zuckerman.com

*Attorneys for Plaintiffs*

46